### David CHENAULT

v.

### Jeff L. WALKER, et al.

Supreme Court of Tennessee at Jackson.

Jan. 12, 2001.

Allan B. Thorp, Memphis, TN, for the appellants, Jo Bursey, Ocean Inn, Inc., and Dimension III Financial, Inc.

Les Jones and Scott J. Crosby, Memphis, TN, for the appellee, David Chenault.

## OPINION

DROWOTA, J., delivered the opinion of the court, in which, ANDERSON, C.J., BIRCH, HOLDER and BARKER, JJ. joined.

The issue in this case is whether the Tennessee long arm statute, Tenn.Code Ann. § 20–2–214, and the Fourteenth Amendment to the United States Constitution allow courts in Tennessee to obtain personal jurisdiction over a defendant based on what has been termed the "con-spiracy theory" of personal jurisdiction. This theory holds that an out-of-state defendant involved in a conspiracy who lacks sufficient "minimum contacts" with the forum state may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum. The Court of Appeals adopted this theory, applied it to the plaintiff's case, and consequently affirmed the trial court's denial of the defendants' motion to dismiss pursuant to Tennessee Rules of Civil Procedure 12.02(2). For the reasons discussed below, we affirm.

The plaintiff, David Chenault, has brought suit against various defendants for fraud, interference with a business relationship, misrepresentation, breach of fiduciary duty, breach of contract, and civil conspiracy, allegations that arise out of business relationships involving hotel property investments which, as explained below, have gone sour. Before discussing the details of these relationships and the investments, it will be useful to briefly describe the parties involved. Chenault, a Tennessee resident, lives in Memphis. The rest of the parties are defendants, some of whom are also appellants before this Court. Jack Moore, a Florida resident, invested in and partly owned the three Florida hotels involved in this case, a Quality Inn, a Comfort Inn, and a Holiday Inn. Moore formed and named himself president of Ocean Inn, Inc. ("Ocean"), a Florida corporation, for the purpose of purchasing the Quality Inn. Although Moore and Ocean are named defendants, only the latter is a party to this appeal. Jo Bursey, a Florida resident, through Dimension III Financial, Inc. ("Dimension"), a Florida corporation of which she is president, was the real estate broker for the sale of the Quality Inn. She also became the majority shareholder in Ocean. Finally, Jeff Walker, a Tennessee resident, allegedly worked as Moore's agent in persuading Chenault—with whom Walker was acquainted—to make the various investments that gave rise to this litigation. Al-

though Walker is a named defendant, he is not a party to this appeal.

## Factual Background

The facts of this case are complicated and disputed. Chenault's version, as outlined in his complaint, begins in April 1997, when Walker, whom he calls his "trusted friend," approached him about an investment opportunity in a Quality Inn. Walker told Chenault that he and his partner Moore needed additional funds ($125,000) to purchase the hotel, and that if Chenault invested this amount he would receive an eight percent ownership interest in Ocean, Moore's corporation that was formed to purchase the hotel. Walker represented himself as the principal investor in Ocean and its vice president. To persuade him to invest, Walker told Chenault to call Bursey, president of Dimension, because she was the mortgage broker for the purchase and the financial consultant for the investment. From Chenault's office in Memphis, he and Walker called Bursey in Florida. She told Chenault that the investment was a "super opportunity," and that profits for the hotel were $800,000 a year.

Chenault decided to invest an initial amount of $25,000. Bursey sent him a contract acknowledging this investment. This document also served as the contract between Ocean and Chenault for the remaining balance of $100,000. Over the next two months, Chenault paid this amount, thereby purchasing an eight percent interest in Ocean. Chenault received a stock certificate showing ownership in Ocean, and a stock distribution agreement with Ocean, which Walker signed on the corporation's behalf. This agreement represents that prior to Chenault's investment Walker and Moore were Ocean's only shareholders.

In July 1997, Walker again contacted Chenault and told him that expensive renovations were needed on the Quality Inn and as a result he and Moore planned to sell their investments. Walker told him he should do the same and then invest in two other Florida hotels which Moore owned, the Comfort and Holiday Inns. Chenault again called Bursey, who confirmed that the second investment was better than the first. She advised him to swap his eight percent ownership in Ocean for a five percent ownership in each of the two hotels, which he did. By the time of this conversation and unbeknownst to him, Bursey had invested in Ocean herself and had become the majority shareholder. Chenault also claims that he repeatedly asked Bursey for complete financial records on the Comfort and Holiday Inns, which she never produced.

Chenault soon came to believe he was the victim of a fraud. He learned that the Comfort and Holiday Inns were on the verge of bankruptcy, and that Walker, Moore, and Bursey failed to disclose this to Chenault prior to his investment. Specifically, he alleges that in June 1997 certain loans on the Comfort and Holiday Inns were in default and that default notices were sent to Moore. To forgive these loans, Moore transferred his interest in Ocean to the lender, Black Acre Bridge Capital, LLC, and, through foreclosure, gave Black Acre ownership of the Comfort and Holiday Inns. Moore, however, needed Chenault's signature to complete the foreclosure settlement, so he and Walker misrepresented the transaction with Black Acre, failing to disclose the poor financial condition of the hotels. Chenault signed a shareholder agreement allowing for foreclosure. He repeatedly asked Walker for documents relating to his ownership of the Comfort and Holiday Inns. Walker never produced them but referred him to Bursey. She never returned his phone calls.

Chenault became concerned about the value of his investments. In December 1997 he called Moore. Moore allegedly told him that a part of his initial $25,000 investment in Ocean had never been used to close on the Quality Inn hotel; instead, Moore and Walker used this money for other purposes. In January 1998 he traveled to Florida to meet with Bursey. Bur-

sey told him that Dimension had only received $100,000 of his money. He also learned during this conversation that Walker had never been an officer or shareholder in Ocean and that Bursey had been the majority shareholder since June 1997. She confirmed, however, that he had been an eight percent owner of Ocean before the stock swap with the Comfort and Holiday Inns. She promised she would send him documents confirming his ownership, but she has not done so.

Chenault alleges that he has never owned any interest in Ocean, and that the stock certificate and stock distribution agreements he was sent were fraudulent. He alleges that Moore, Bursey, and Walker knew from the start that he would not and did not own any shares in Ocean; all their efforts were part of a conspiracy designed to trick him into investing in the Comfort and Holiday Inns, whose shaky financial condition they failed to disclose. He lost his entire investment.

Defendants Moore, Ocean, Bursey, and Dimension moved to dismiss Chenault's case for lack of personal jurisdiction. Moore and Bursey each filed an affidavit in support of their motion in which they deny Chenault's factual allegations. In his affidavit, Moore states that he has never met Chenault, nor has he ever solicited money from him. In August or September of 1997 he visited Walker in Memphis and remembers talking to Chenault when Chenault and Walker spoke over the telephone. Moore describes this conversation as follows: "[It] was general in nature about business I was involved in and I made no representations or inducements to Mr. Chenault at any time regarding the validity or the profitability of a particular investment." In December 1997 Chenault called Moore in Florida and told him he planned to sue him, Walker, and Bursey for not telling the truth about the hotel investments. Chenault later asked Moore to join him in a suit against Walker and Bursey, and acknowledged that Moore had never solicited money from him. Chenault called Moore on two other occasions and repeated his request that he join in a suit against Walker and Bursey. Moore ends his affidavit by reiterating that he never tried to persuade Chenault to invest in his business interests; all the contacts Chenault had were with Walker and Bursey.

Bursey's affidavit states that although she worked with Moore on the Ocean transaction, she never called Walker or Chenault or solicited money from them; they called her, and she merely responded to their questions. Since Chenault indicated that he wanted to invest, Bursey, through Dimension, sent him a fax inquiring who would own the shares of Ocean and who would provide the money for the closing on the Quality Inn. Chenault did not respond to this fax. Chenault claims that Bursey sent him another document along with this fax which was signed by Walker on behalf of Ocean, but she denies ever having sent this document or even having seen it prior to being served with Chenault's complaint.

Bursey also addresses how she became a majority shareholder of Ocean. She states that prior to the Quality Inn closing Moore called her to say he did not have sufficient funds to proceed with the transaction. The two agreed that Dimension would invest in the venture in return for a fifty-one percent shareholder interest. Bursey alleges that there was nothing improper in this arrangement, which was necessary for the deal to go through. In June 1997 Ocean purchased the Quality Inn. Bursey then became president of Ocean. She states that at all times through the closing Moore occupied all officer positions, including that of vice president; Walker was never an officer and she did not know he purported to act on behalf of Ocean.

Bursey also addresses the Comfort and Holiday Inns stock swap transaction. She states that once again Chenault called her; she never sought to discuss the deal with him or solicit his business. Chenault called her to say that he had cancelled his shares in Ocean and exchanged them for

shares in the Comfort and Holiday Inns. This was the last telephone conversation she had with him.

The gist of the appellants' argument is that Walker, the only Tennessee resident defendant, acted on his own. Since they never asked Walker to represent them, nor did they know he purported to act on their behalf, there can be no conspiracy. Since there is no conspiracy, Tennessee courts have no jurisdiction over them to preside over Chenault's suit: they are Florida residents, their corporations have no offices, assets, or employees in Tennessee, all the hotels are located in Florida, and the closings on the transactions at issue occurred in Florida.

Chenault has submitted three affidavits challenging Moore's and Bursey's version of the events. Chenault states that Walker continually represented that he was Moore's partner as well as the principal investor in and vice president of Ocean, and that he claimed Bursey was working with him as the broker and financial consultant on the Quality Inn closing. Walker asked Chenault to call Bursey for advice regarding the investment in Ocean and she stated that it was a "super opportunity." Chenault also provides a copy of the fax Bursey states she never sent, which appears to indicate that it came from Dimension's office, thereby suggesting that Bursey knew Walker claimed he was a representative of Ocean.

Chenault also states that Bursey gave a promising estimate of the Comfort and Holiday Inns transaction and advised in favor of the stock swap. Chenault agreed to the stock swap and then repeatedly called Bursey to request relevant financial documents. She did not return his calls.

Finally, Chenault reaffirms his allegation that Walker represented Moore, stating that these two had solicited his invest-

ments on prior occasions for properties unrelated to this suit. He states that Walker came to him on behalf of Moore because Moore needed more funds to purchase the Quality Inn. He also states that when he spoke to Moore on Walker's phone Moore told him he was welcome as an investor in Ocean and that he looked forward to working with him over the next few years. Chenault repeats his assertion that Moore never told him about the poor financial condition of the Comfort and Holiday Inns. He also states: "Moore admitted that Jo Bursey received $100,000 from me, but he did not know where it was. He stated further that of my initial $25,000 investment, he received $7,500, Jeff Walker received $7,500, and he believed the other $10,000 was used in some way for the two failing hotels. Thus, he has admitted to me, at a minimum, that he has converted $7,500 of my $125,000 investment to his own use."

### Procedural Background

The trial court denied the defendants' motion to dismiss. Pursuant to the defendants' interlocutory appeal, the Court of Appeals affirmed,[1] reasoning as follows:

> [W]e conclude that the trial court did not err in finding in personam jurisdiction of the appellants. Chenault alleges a conspiracy to defraud and details the particulars of the defendants' activities. His affidavit supports the allegations, and while the defendants have filed affidavits in support of their motion, the affidavits do contain some discrepancies. The allegations of the alleged misrepresentation by defendant Walker and defendant Bursey and the alleged admissions on the part of Moore, along with the intertwined relationship between the parties and both corporations are sufficient. . . .

1. The trial court granted the defendants a Rule 9 appeal, which the Court of Appeals denied. This Court subsequently granted the defendants' application for permission to appeal and summarily found that the Court of Appeals erred in denying the application for interlocutory appeal. The case was remanded to the Court of Appeals for a decision on the merits.

In so holding, the Court of Appeals appeared to accept the trial court's determination that personal jurisdiction could not be based on Moore's, Ocean's, Bursey's, and Dimension's contacts with the state of Tennessee. Insofar as these defendants have sufficient contacts with Tennessee it is only through Walker's agency—an agency created by the defendants' conspiracy. Therefore, examining both state law and federal constitutional law, the Court of Appeals decided to adopt what some courts have referred to as the "conspiracy theory of personal jurisdiction." This theory holds that an out-of-state defendant involved in a conspiracy who lacks sufficient "minimum contacts" with the forum state may nevertheless be subject to jurisdiction because of a co-conspirator's contacts with the forum. We must decide, first, whether Tennessee law recognizes this theory and, second, whether the facts, as stated above, warrant the application of this theory to Chenault's case. For the reasons discussed below, we affirm the Court of Appeals on both issues.

## Analysis

### A. The Validity of the Conspiracy Theory

■ The issue before us is whether the defendants' motion to dismiss for lack of personal jurisdiction should be granted. *See* Tenn. R. Civ. P. 12.02(2). The resolution of this issue depends on whether the conspiracy theory of personal jurisdiction should be adopted, which requires an interpretation of the Tennessee long-arm statute, Tenn.Code Ann. § 20–2–214(a), and the due process clause of the Fourteenth Amendment to the United States Constitution. As this is a question of law, our standard of review is de novo, without a presumption of correctness. *See Nelson v. Wal–Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn.1999).

The relevant portion of the Tennessee long-arm statute reads:

(a) Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:

＊　　＊　　＊

(2) Any tortious act or omission within the state;

＊　　＊　　＊

(6) Any basis not inconsistent with the constitution of this state or of the United States.

Tenn.Code Ann. § 20–2–214. The statute provides that "person" includes corporations and other entities. Tenn.Code Ann. § 20–2–214(b). It also provides that "[a]ny such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner above described through an agent or personal representative." Tenn.Code Ann. § 20–2–214(c). In 1997 the General Assembly added a new long-arm provision to the Tennessee Code, which provides: "A court may exercise personal jurisdiction over a person, who acts directly or indirectly, as to a claim for relief arising from the person's.... [c]ausing tortious injury by an act or omission in this state...." Tenn. Code Ann. § 20–2–223(a), (a)(3).

■ There is no doubt that Chenault has sufficiently alleged that Walker has committed a "tortious act .... within the state," Tenn.Code Ann. § 20–2–214(a)(2), for the long-arm statute covers such wrongful conduct as fraud, misrepresentation, and civil conspiracy, and Walker allegedly committed such acts while in Tennessee. Moreover, if a tortious act is committed outside the state and the resulting injury is sustained within the state, the tortious act and the injury are inseparable, and jurisdiction lies in Tennessee. *See Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240, 244 (Tenn. 1972); *Godwin Aircraft, Inc. v. Houston*, 851 S.W.2d 816, 820 (Tenn.Ct.App.1992).

The question in this case is whether appellants Ocean, Bursey, and Dimension—all of whom are Florida residents—have also done so. The trial court found that absent the alleged conspiracy these appellants had insufficient contacts with Tennessee. The Court of Appeals agreed and held that conspiracy was a proper basis on which to find jurisdiction, and that Chenault's allegations, supported by the affidavits in the record, were sufficient to allow the case to proceed under the conspiracy theory. We must decide whether the lower courts were correct, that is, whether by virtue of a civil conspiracy to defraud Chenault, Walker's contacts with Tennessee may be imputed to Ocean, Bursey, and Dimension.[2]

The notion of the imputation of jurisdictional contacts is nothing new. Indeed, the long-arm statute itself provides that an agent's (or personal representative's) tortious acts in Tennessee on behalf of a principal will allow a court to exercise jurisdiction over that principal. *See* Tenn. Code Ann. § 20–2–214(c). That a principal can be subject to suit, or, in general, be made liable for the conduct of his agent finds its parallel in conspiracy law. It is firmly established in our law that a conspirator can be liable for the conduct of a co-conspirator. In *Dale v. Thomas H. Temple Co.* we stated:

> Since it is [a] basic principle that each conspirator is responsible for everything done by his confederate which the execution of the common design makes probable as a consequence, the law applying no gauge to ascertain relative activity in the production of that consequence, it follows that each is liable for all damages naturally flowing from any wrongful act of a coconspirator in carrying out such common design.

186 Tenn. 69, 90–91, 208 S.W.2d 344, 354 (1948). *Accord Huckeby v. Spangler*, 521 S.W.2d 568, 573–74 (Tenn.1975).

■ Moreover, Chenault has sufficiently alleged that the defendants have engaged in a civil conspiracy to defraud. This tort has been defined as a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale*, 186 Tenn. at 90, 208 S.W.2d at 353. *See also Huckeby*, 521 S.W.2d at 573; *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn.Ct.App.1993); *Kirksey v. Overton Pub, Inc.*, 739 S.W.2d 230, 236 (Tenn.Ct.App.1987). This Court in *Dale* further explained that a conspiracy to defraud means a "common purpose, supported by a concerted action to defraud, that each [conspirator] has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has that purpose." *Dale*, 186 Tenn. at 90, 208 S.W.2d at 353–54. Also, the "agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id.* There is no question that Chenault's complaint, which contains specific, detailed allegations, sufficiently charges the defendants with a conspiracy to defraud him.

Therefore, under section 20–2–214(a)(2) and section 20–2–223(3), Chenault's complaint alleges causes of action which would allow a Tennessee court to assert long-arm jurisdiction over the defendants. Even if this were not the case, however, section 20–2–214(a)(6) permits a Tennessee court to obtain personal jurisdiction over a defendant on any basis not inconsistent with the state or federal constitutions. *See J.I. Case Corp. v. Williams*, 832 S.W.2d 530, 531 (Tenn.1992) ("This statute reaches as far as the Due Process Clause of the Four-

---

**2.** Chenault argues that, apart from the conspiracy, all of the defendants have sufficient contacts with Tennessee based on their own conduct. Because we hold that the conspiracy theory of personal jurisdiction is valid, and that it can be applied here, we find it unnecessary to address this argument.

teenth Amendment permits."). But whichever section of the long-arm statute is employed, the exercise of jurisdiction must comport with the United States Constitution.

■ Before addressing the constitutional standards, however, it will be useful to state the conspiracy theory of personal jurisdiction succinctly. This has been done in *Cawley v. Bloch,* 544 F.Supp. 133 (D.Md.1982), where the court articulated the theory as follows:

Under [this] doctrine, when

(1) two or more individuals conspire to do something,

(2) that they could reasonably expect to lead to consequences in a particular forum, if

(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state,

then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Cawley,* 544 F.Supp. at 135. Is this test constitutional?

■ Due process requires that an out-of-state defendant can be subject to personal jurisdiction only if he has such minimum contacts with the forum state that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *J.I. Case,* 832 S.W.2d at 531–33 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–78, 105 S.Ct. 2174, 2181–84, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–94, 100 S.Ct. 559, 564–66, 62 L.Ed.2d 490 (1980). In the absence of continuous and systematic contacts with the forum state, personal jurisdiction exists if a "commercial actor purposely directs his activities toward citizens of the forum state and litigation results from injuries arising out of or relating to those activities." *J.I. Case,* 832 S.W.2d at 532 (citing *Burger King,* 471 U.S. at 472–73, 105 S.Ct. at 2182). In such a case, "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Masada Investment Corp. v. Allen,* 697 S.W.2d 332, 334 (Tenn.1985) (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567); *see also Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). This standard ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2184 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). In addition to an evaluation of the defendant's contacts and their connection to the plaintiff's cause of action, courts consider two lesser factors: the forum state's interest in exercising jurisdiction and the convenience to the parties. *See J.I. Case,* 832 S.W.2d at 532; *Masada,* 697 S.W.2d at 334.

■ This well-established constitutional framework for evaluating personal jurisdiction can be difficult to apply depending on the strength of the defendant's contacts with the forum state. But, in the abstract, we find nothing explicit or implicit in these constitutional principles that would prohibit the exercise of jurisdiction based on the imputation of a co-conspirator's minimum contacts. To the contrary, we think that the conspiracy theory follows plainly from the very definition of conspiracy and the meaning of co-conspir-

ator liability: the acts of a conspirator in furtherance of an illegal agreement with his co-conspirator are attributed to that co-conspirator. *See Dale*, 186 Tenn. at 90–91, 208 S.W.2d at 353–54. If due process does not prevent that co-conspirator from being held civilly or criminally responsible based on the principle of imputed conduct, it is difficult to see why it should prevent the exercise of jurisdiction based on that same principle. Rather, given the notion of conspiracy liability, the conspiracy theory of jurisdiction is premised on principles of common sense and basic fairness. As one court has put it, "[i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) (Posner, J.).

Moreover, we think that the articulation of the conspiracy theory in *Cawley v. Bloch* accurately reflects the due process standards discussed above. Under that articulation, for the principle of imputed conduct to apply the co-conspirator must commit an overt act in furtherance of the conspiracy which, if committed by the out-of-state defendant, would subject that defendant to personal jurisdiction under the long-arm statute of the forum state. *See Cawley*, 544 F.Supp. at 135. In other words, a court must always determine that it could exercise jurisdiction over the conspirator whose conduct is to be attributed to the defendant consistently with *International Shoe* and its progeny.

As is true of personal jurisdiction generally, there will be hard cases presented under the conspiracy theory, and these must be decided based on a careful consideration of the record. But we are aware of no good reason to bar the application of this theory as a matter of law where the plaintiff has made specific, credible allegations which are supported by the evidence.

We recognize that this theory has been criticized in various jurisdictions. For example, a Georgia court has noted that "[t]o hold that a non-resident who personally has conducted no activity in or with Georgia is subject to our jurisdiction based solely upon the theory of a conspiracy would eliminate the requirement for a 'minimum contact' between the defendant and this forum. Without the 'minimum contact' there would be no due process limitation on this state's extraterritorial power over non-residents." *Coopers & Lybrand v. Cocklereece*, 157 Ga.App. 240, 276 S.E.2d 845, 850 (1981) (internal citations omitted). *But see Rudo v. Stubbs*, 221 Ga.App. 702, 472 S.E.2d 515, 517 (1996) (allowing for the application of the conspiracy theory where the alleged conspiracy is specifically targeted at a state resident). Similarly, the Supreme Court of Texas has held that personal jurisdiction may not be asserted over a non-resident based solely upon effects or consequences of an alleged conspiracy with residents of the forum state. *National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769 (Tex.1995) (restricting its inquiry to whether the non-resident himself purposefully established minimum contacts with the forum). Nevertheless, a number of jurisdictions have adopted the conspiracy theory. *See, e.g., Textor v. Board of Regents*, 711 F.2d 1387, 1392 (7th Cir.1983) ("[I]f plaintiff's complaint alleges an actionable conspiracy then the minimum contacts test has been met. The 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.' ") (citation omitted); *General Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F.Supp. 656, 664–66 (E.D.Mich.1996); *Dooley v. United Technologies Corp.*, 786 F.Supp. 65, 78–80 (D.D.C.1992); *Cawley*, 544 F.Supp. at 134–35.

■ Thus, there is a difference of opinion in the case law. For the reasons discussed above, however, we hold that the conspiracy theory of personal jurisdiction, premised on the basic principle of conspir-

acy liability, fits within the Tennessee long-arm statute and comports with due process.

## B. Application of the Conspiracy Theory to Chenault's Case

Having adopted the conspiracy theory of personal jurisdiction, we must now decide whether Chenault's case, with the specific facts thus far in the record, may proceed under that theory. The Court of Appeals found that "the allegations of the alleged misrepresentation by defendant Walker and defendant Bursey and the alleged admissions on the part of Moore, along with the intertwined relationship between the parties and both corporations are sufficient" for conspiracy jurisdiction to be present. We agree.

Before stating the reasons for our view, however, it is necessary to discuss the standards under which motions to dismiss for lack of personal jurisdiction should be decided. The issue may be stated as follows: With what certainty must the facts be established in the record for a judge to determine that personal jurisdiction exists over the defendants? The issue is framed this way because of the unique way in which personal jurisdiction differs from other grounds supporting a motion to dismiss. Under the Tennessee Rules of Civil Procedure a motion to dismiss may be based on one or more of eight grounds, including lack of personal jurisdiction and failure to state a claim on which relief can be granted. *See* Tenn. R. Civ. P. 12.02. A court either decides this motion based on the allegations contained in the pleadings or, if matters outside the pleadings—such as affidavits—are presented, the court will treat the motion as one for summary judgment as provided in Tenn. R. Civ. P. 56. *See* Tenn. R. Civ. P. 12.03.

As we have stated in the past, however, Rule 12.03 does not apply to a motion to dismiss for lack of personal jurisdiction, unless the evidence brought to the court is so conclusive that the motion may be fully and finally resolved on the merits. *See*

*Nicholstone Book Bindery, Inc. v. Chelsea House Publishers,* 621 S.W.2d 560, 561 n. 1 (Tenn.1981) ("[S]ummary judgment procedure does not properly apply to jurisdictional issues.") (quoting 6 Moore, Federal Practice (Part 2) § 56.17(36) at 913 (1980)). Often a complete resolution of the jurisdictional issue is not possible at the beginning of litigation because not enough evidence has been developed; indeed, discovery will not have yet begun. This gives rise to a dilemma. If a court seeks to develop more evidence, by ordering discovery or an evidentiary hearing, the burden on an out-of-state defendant may in some cases be nearly as great as if the court simply ruled from the start that jurisdiction was present and allowed the litigation to proceed. But allowing a court to decide whether jurisdiction exists based entirely on the pleadings, as a court may do when confronted with one of the other grounds to dismiss listed in Rule 12.02, is hardly a better solution. This is especially true if jurisdiction is sought based on a conspiracy theory. As one court has stated:

> The cases are unanimous that a bare allegation of a conspiracy between the defendant and a person within the personal jurisdiction of the court is not enough. Otherwise plaintiffs could drag defendants to remote forums for protracted proceedings even though there were grave reasons for questioning whether the defendant was actually suable in those forums. A defendant could always refuse to appear, and take his chances, but then it would be easy for the plaintiff, lacking an opponent, to "prove" that there really had been a conspiracy and obtain a default judgment that the defendant could not upset.

*Stauffacher,* 969 F.2d at 460.

Regardless of the theory on which personal jurisdiction is based, though, the necessity of adopting a middle-ground solution—between relying merely on the pleadings and postponing a decision on jurisdiction until discovery has been completed—is apparent. Many federal

courts have dealt with this issue, and there appears to be considerable agreement on several aspects of the procedure necessary to determine whether the evidence in favor of finding jurisdiction is sufficient to allow the case to proceed. *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1351 (Supp.2000). It is clear that the plaintiff bears the ultimate burden of demonstrating that jurisdiction exists. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135, 1141 (1936); *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n,* 142 F.3d 26, 34 (1st Cir.1998). If the defendant challenges jurisdiction by filing affidavits, the plaintiff must establish a prima facie showing of jurisdiction by responding with its own affidavits and, if useful, other written evidence.[3] *See Posner v. Essex Ins. Co. Ltd.,* 178 F.3d 1209, 1214 (11th Cir.1999); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2nd Cir.1999); *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir.1998). A court will take as true the allegations of the nonmoving party and resolve all factual disputes in its favor, *see Posner,* 178 F.3d at 1215; *IMO Industries, Inc. v. Kiekert AG,* 155 F.3d 254, 257 (3rd Cir.1998), but it should not credit conclusory allegations or draw farfetched inferences, *see Massachusetts School of Law,* 142 F.3d at 34.

We find that this procedure for evaluating a defendant's motion to dismiss under Tenn. R. Civ. P. 12.02(2) is sensible and not inconsistent with any rule or case in Tennessee of which we are aware, and we therefore adopt it. We must now decide whether the trial and appellate courts in this case correctly ruled that the defendants' motion should be denied and that

the litigation should proceed under the conspiracy theory of jurisdiction.

▉ Chenault's complaint and several affidavits set forth precise allegations and specific facts supporting a prima facie showing of jurisdiction, i.e., that the defendants engaged in a civil conspiracy to defraud him. His case rests on neither conclusory allegations nor farfetched inferences. *See Massachusetts School of Law* 142 F.3d at 34. Of course, at this stage of the litigation, confronted with a motion to dismiss, we do not make any finding as to whether Chenault's version of events is, in fact, correct. That will be for a jury to decide if the case goes to trial. Following the standards set forth in many federal courts, however, we find that the plaintiff has made a prima facie showing of civil conspiracy that is supported by his affidavits and not sufficiently refuted by Bursey's and Moore's affidavits.

The Court of Appeals aptly referred to "the intertwined relationship between the parties and both corporations" as lending credence to Chenault's allegations. It is clear that Moore and Ocean worked with Bursey and Dimension on the Quality Inn and Comfort and Holiday Inns transactions. It is clear that Chenault dealt with Bursey and Dimension on these transactions, though they dispute Bursey's role in their discussions. The record appears to show that Chenault was prompted to invest in these deals by Walker's efforts. The dispute, therefore, concerns whether Walker was Moore's and Ocean's agent or representative, and what was the extent of Bursey's involvement in these events. As an initial matter, though, we hold that the fourth prong of the *Cawley v. Bloch* test, designed to meet the strictures of the "minimum contacts" test, is clearly satisfied here.[4] There is no dispute that Walk-

---

**3.** In deciding whether the plaintiff has met its burden a court may find it necessary to permit limited discovery or conduct an evidentiary hearing to resolve any apparent factual questions. *See, e.g., Theunissen v. Matthews,* 935 F.2d 1454, 1458 (6th Cir.1991).

**4.** This prong concerns whether the co-conspirator's "acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state." *Cawley,* 544 F.Supp. at 135.

er, a Tennessee resident, is subject to personal jurisdiction. The issue is whether his conduct may be attributed to the out-of-state defendants, which depends on whether Chenault's allegations and affidavits establish a prima facie case of civil conspiracy.

Chenault has met his burden of establishing Walker's relationship with Moore and Ocean. According to Chenault, Walker and Moore, as business partners, needed $125,000 in additional funds to purchase the Quality Inn. Moore states in his affidavit that he never personally solicited funds from Chenault, yet he does not sufficiently deny that he and Walker were partners. Indeed, as he admits, when Moore first spoke with Chenault over the phone he was visiting Walker in Memphis. The two discussed business opportunities. Moore characterizes these conversations as general in nature, but Chenault claims that Moore told him he was welcome as an investor in Ocean and that he looked forward to working with him over the next few years. Chenault also alleges that Moore and Walker had solicited his investments on prior occasions for properties unrelated to this suit. As both the trial and appellate courts found, a strong inference can be made that Walker and Moore together sought Chenault's involvement in the Ocean transaction.

Chenault also states that Walker claimed to be a representative of Ocean, indeed its vice president. While it is possible that Walker lied about his connection with Ocean, his actual corporate status is not of great importance. Instead, what matters at this stage of the litigation is whether Walker held himself out as Ocean's representative and, more important, whether Moore knew and approved of his doing so. On this point, the evidence shows that Walker not only told Chenault he worked for Ocean but that he signed a stock distribution agreement, which Bursey sent to Chenault, purportedly on behalf of Ocean. Moore never denies Walker's involvement with Ocean in his affidavit. Lending further support to the Walker/Moore connection, Chenault states that Moore admitted that he and Walker had misappropriated a portion of his initial $25,000 investment in Ocean. This factual record, while not entirely clear, reasonably suggests that Walker and Moore worked together in pursuing the Ocean transaction, that Walker made Chenault aware of this fact, and that Moore knew of and tacitly approved Walker's representations.

Chenault has also met his burden of establishing Bursey's and Dimension's likely involvement in the alleged conspiracy. Bursey claims that she had a limited business relationship with Chenault. Regarding both transactions—Ocean and the stock swap—she claims that he called her, not for investment advice but only to consummate the transaction. We do not know what was said in these conversations, but we do not have good reason to doubt Chenault's claim that he asked her for advice. Walker had represented to him that Bursey, through Dimension, was both the broker and the financial consultant on the deal. Chenault states that for both transactions he wished to get a second opinion before investing. Indeed, he claims that Walker told him to call Bursey, who would be able to persuade him to invest, and that when he did she spoke very positively about both business opportunities.

Chenault also states that he repeatedly asked Bursey for information and documents relating to the deal but she ignored these requests. He further states that Bursey never disclosed to him the poor financial condition of the Comfort and Holiday Inns. These allegations are important because of Chenault's claim that, unbeknownst to him, Bursey was not only the broker and financial consultant but had become the majority shareholder in Ocean. Even if this fact does not by itself indicate any wrongdoing, it provides a link between Bursey/Dimension and Moore/Ocean that helps establish Chenault's prima facie case.

Chenault also states in his affidavit that Bursey was aware of Walker's involvement in the alleged conspiracy. Chenault states that the stock distribution agreement Bursey faxed to him listed Walker as Ocean's representative. Bursey denies this claim in her affidavit. Chenault responds by pointing to a copy of the fax page with Walker's name listed on the bottom, which appears to indicate that it came from Dimension's office. This evidence provides a link between Bursey and Walker, lending support to Chenault's prima facie case.

These allegations and affidavits indicate that Chenault has made out a prima facie case that the court has jurisdiction over Ocean, Bursey, and Dimension based on a conspiracy involving all the defendants. We therefore agree with the Court of Appeals that the case should proceed to the discovery stage. We also agree with that court's admonition that "discovery and/or trial may dispel our perception, but Rule 11 of the Tennessee Rules of Civil Procedure can be utilized to provide some protection to the defendants." Even further, we emphasize that if the evidence established through the process of discovery reasonably casts doubt on the accuracy of Chenault's allegations or affidavits, nothing will preclude the defendants from renewing their motion to dismiss for lack of personal jurisdiction.

### Conclusion

For the reasons discussed above, we affirm the judgments of the trial court and the Court of Appeals and hold that the conspiracy theory of personal jurisdiction comports with our long-arm statute and the United States Constitution. We also hold that the plaintiff has established a prima facie case that the defendants are subject to personal jurisdiction in Tennessee based on this theory.