# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 8, 2008 Session

## FIRST SOUTHERN MORTGAGE CORPORATION OF TENNESSEE v. MICHAEL H. WEISSER

**Appeal from the Chancery Court for Williamson County**
**No. 32041      R. E. Lee Davies, Chancellor**

---

**No. M2007-01027-COA-R3--CV - Filed June 26, 2008**

---

A mortgage broker filed this breach of contract action against a real estate investor based upon the investor's failure to pay a loan placement fee. The trial court granted summary judgment in favor of the mortgage broker. Because we find that there are genuine issues of material fact, we reverse the decision of the trial court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

L. Gino Marchetti, Jr., Nashville, Tennessee, for the appellants, Michael H. Weisser.

Garry K. Grooms, Nashville, Tennessee, for the appellee, First Southern Mortgage Corporation of Tennessee.

## OPINION

Michael H. Weisser is a real estate investor with ownership interests in various companies that own commercial properties such as malls and shopping centers. Mr. Weisser lives and has his offices in Florida; the companies in which he has interests own properties outside of Florida. For many years, Mr. Weisser has done business with Stephen Brink, a mortgage broker with First Southern Mortgage Corporation of Tennessee ("First Southern"), a Tennessee corporation with offices in Brentwood, Tennessee. Mr. Brink helped Mr. Weisser procure financing for a number of real estate ventures; for his services, Mr. Weisser paid Mr. Brink's company a loan placement fee.

The present dispute involves Mr. Weisser's efforts to purchase a shopping center in Hazard, Kentucky, whose main tenant was a Wal-Mart store. Mr. Weisser contacted Mr. Brink in early 2004 seeking his assistance in obtaining a mortgage loan commitment in the amount of 22 million dollars in order to buy the shopping center. Mr. Weisser had a contract with the seller to buy the shopping

center, but Wal-Mart had exercised its right of first refusal and submitted to the seller a counterproposal to purchase the property. Mr. Weisser filed a lawsuit in federal district court in Kentucky to resolve the question of whether he had the right to acquire the property.[1]

Mr. Brink agreed to help Mr. Weisser obtain financing for the Wal-Mart shopping center, and Mr. Weisser agreed to pay Southern Mortgage a loan placement fee in the amount of $150,000. The parties now disagree as to when the loan placement fee was to be earned and payable. According to Mr. Weisser, he and Mr. Brink agreed that the loan placement fee would not be owed to First Southern if the transaction never closed, in view of the speculative nature of the purchase and in accordance with the parties' past practice. As will be discussed below, Mr. Brink disputes this characterization of his agreement with Mr. Weisser.

On March 30, 2004, Mr. Weisser submitted a completed loan application to PNC Bank ("PNC"). In accordance with the lender's requirements, the loan application identified the borrower as "a to-be-formed single asset entity." Mr. Weisser signed the loan application for the borrowing entity. The terms and conditions of the loan application included a statement that First Southern was acting as mortgage banker and that the borrower was responsible for paying the mortgage banker a fee of $150,000. The application also required that the borrower provide the lender prior to closing with an estoppel certificate from any commercial tenant occupying at least 10% of the property's leasable area.

On August 20, 2004, PNC sent Mr. Weisser a letter with the caption "Rider to Loan Application" informing him that PNC had approved the loan application "from a to-be-formed single asset entity ('Borrower') for a first mortgage loan, subject to the terms and conditions of the Application and this Rider." The loan application, the rider, and any other amendments were collectively termed the "Commitment." The Commitment was to expire by August 31, 2004, unless a fully executed original of the rider and a commitment fee were received by PNC. The Commitment was also to expire if the loan had not closed by December 31, 2004. The rider contained conditions or changes to the loan application, including the following: "In addition to being otherwise satisfactory to Lender, Wal-Mart's estoppel must provide that the operation of a 'Dollar Store' in a shopping center adjacent to the Property will not be a violation of Wal-Mart's lease." Mr. Weisser signed and accepted the Commitment on behalf of "a to-be formed single asset entity" on September 1, 2004.

On August 23, 2004, Mr. Weisser and Mr. Brink signed a Loan Placement Agreement giving First Southern the exclusive right to negotiate a mortgage loan commitment on behalf of the applicant for the Wal-Mart property in Hazard, Kentucky. Mr. Weisser signed the agreement on behalf of MHW Properties, Inc., a property management company in which Mr. Weisser had an ownership interest. Mr. Weisser testified that MHW Properties had nothing to do with the

---

[1]*Weisser v. CP Hazard Assocs. Limited Partnership and Wal-Mart Real Estate Business Trust*, No. 6:04-CV-15-KKC (E.D. Ky filed Jan. 14, 2004).

acquisition of the property in Hazard, Kentucky.[2]  Mr. Brink testified that First Southern had mistakenly put MHW Properties on the loan placement agreement.

PNC and Mr. Weisser subsequently entered into various amendments to the Commitment. On September 15, 2004, PNC sent Mr. Weisser a letter agreeing, with one exception, to amend the Commitment in accordance with changes made by Mr. Weisser to the rider to the loan application. Mr. Weisser, in turn, conditioned his acceptance of the amendments on two additional changes. On October 15, 2004, Mr. Weisser signed on behalf of "a to-be-formed single asset entity" a "First Amendment to Commitment" which provided, in pertinent part:

> Lender agrees to all of the changes that the Borrower made to the Rider to the Loan Application, with the exception of the change to special condition g [concerning the estoppel certificate].  Lender will only waive this requirement so long as Lender receives a letter from Wal-Mart acknowledging Dollar Store as a tenant and that their tenancy is not a violation of the their [sic] lease covenants.
>
> . . . .
>
> Borrower will obtain an Estoppel Letter from Wal-Mart in a form acceptable to Lender.  Lender will not proceed with the closing until such form has been accepted or Borrower has authorized Lender to proceed with closing.
>
> Lender will hold the good faith deposit check in the amount of $228,000 until given written instruction from Borrower (that the Wal-Mart situation re: the Estoppel Letter has been cleared up and a closing set or the Borrower wants to lock the rate).

A second amendment on October 15, 2004, extended the Commitment expiration date to February 18, 2005.  A third amendment on February 17, 2005, extended to expiration date to April 29, 2005 and contained other provisions not relevant to the present dispute.  A fourth amendment extended the expiration date to June 30, 2005.  A fifth amendment extended the expiration date to August 10, 2005.

Mr. Weisser claims that he was unable to meet certain conditions of the Commitment and was therefore unable to close on the purchase of the property with the PNC financing.  It appears that Mr. Weisser's main trouble closing the transaction with PNC was Wal-Mart's refusal to issue an estoppel letter acceptable to PNC.  Mr. Weisser notified PNC in a letter dated September 8, 2005, of his decision not to use PNC financing.

Nevertheless, the purchase did go through.  Mr. Weisser transferred his contractual right to purchase the shopping center to an entity in which he and some of his family members owned interests.  That entity, Hazard Supercenter, LTD, purchased the shopping center from the seller for

---

[2]Mr. Weisser testified by affidavit that MHW Properties had not done any business since February 2003 and had no connection with the transactions at issue here.

$24,512,000 in August 2005 and assumed the seller's existing mortgage. About a month later, Hazard Supercenter, LTD sold the shopping center for more than 30 million dollars.

Southern Mortgage filed this breach of contract action in November 2005 against Mr. Weisser and MHW Properties, Inc. seeking a judgment in the amount of $140,000 for the defendants' failure to pay the loan commitment fee. The defendants responded with a motion to dismiss for lack of jurisdiction on the basis that the court lacked personal jurisdiction over the defendants. The trial court denied the defendants' motion to dismiss on March 22, 2006, and denied the defendants' motion to reconsider on May 2, 2006. In an answer filed on May 1, 2006, the defendants denied any breach of contract and raised affirmative defenses of unclean hands, impossibility of performance, breach of fiduciary capacity, equitable estoppel and waiver, failure of consideration, lack of jurisdiction, improper venue, and failure to state a claim upon which relief can be granted.[3]

First Southern filed a motion for summary judgment as to defendant Mr. Weisser on January 26, 2007, accompanied by an affidavit of Mr. Brink and the deposition of Mr. Weisser as well as a statement of undisputed material facts. The defendants responded with affidavits by Mr. Weisser, affidavits from a mortgage broker, the deposition of Mr. Brink, and a response to First Southern's statement of undisputed material facts challenging many of First Southern's statements. In an order entered on March 16, 2007, the court made findings of fact and found that the language of the loan placement agreement was clear and unambiguous. Finding that there were no genuine issues of material fact and that First Southern was entitled to judgment as a matter of law, the court granted First Southern's motion for summary judgment against Mr. Weisser. The court denied the defendants' motion to alter or amend. In April 2007, First Southern filed a motion of voluntary dismissal as to MHW Properties. Mr. Weisser appeals the summary judgment against him.

On appeal, Mr. Weisser challenges the trial court's failure to grant his motion to dismiss based upon the lack of personal jurisdiction and improper venue. Mr. Weisser further argues that the trial court erred in granting summary judgment to First Southern.

### Jurisdiction

Although the defendants' motion to dismiss was initially unsupported, First Southern responded by filing Mr. Brink's affidavit and, in support of a motion to reconsider, the defendants submitted Mr. Weisser's affidavit. We will, therefore, treat the defendants' motion as a "factual" challenge, as distinguished from a "facial" challenge, to jurisdiction, which requires this court to make at least a preliminary determination with respect to the relevant facts. *Midwestern Gas Transmission Co. v. Baker*, No. M2005-00802-COA-R3-CV, 2006 WL 461042, *12 (Tenn. Ct. App. Feb. 24, 2006). The following principles set forth by our Supreme Court are applicable:

---

[3]In July 2006, Mr. Weisser filed suit against PNC and First Southern in Florida seeking damages in excess of $350,000 for PNC's failure to return refundable deposit monies and a declaratory judgment that First Southern is not entitled to the payment of any fees in connection with the loan transaction. *Weisser v. PNC Bank, National Ass'n, and First Southern Mortgage Corp. of Tennessee*, No. 06-13763CA31 (Fla. Cir. Ct. filed July 14, 2006).

-4-

> It is clear that the plaintiff bears the ultimate burden of demonstrating that jurisdiction exists. If the defendant challenges jurisdiction by filing affidavits, the plaintiff must establish a prima facie showing of jurisdiction by responding with its own affidavits and, if useful, other written evidence. A court will take as true the allegations of the nonmoving party and resolve all factual disputes in its favor, but it should not credit conclusory allegations or draw farfetched inferences.

*Chenault v. Walker*, 36 S.W.3d 45, 56 (Tenn. 2001) (citations omitted). With respect to a trial court's determination as to whether the plaintiff established a prima facie case of personal jurisdiction, our standard of review is de novo with no presumption of correctness. *Progeny Mktg. v. Farmers & Merchs. Bank*, No. M2003-02011-COA-R3-CV, 2005 WL 819732, *1 (Tenn. Ct. App. Apr. 7, 2005).

What is necessary to establish a prima facie case of personal jurisdiction? Tennessee's long-arm statute, particularly Tenn. Code Ann. § 20-2-214, allows Tennessee courts to exercise *in personam* jurisdiction on any basis not inconsistent with the state or federal constitutions. *Chenault*, 36 S.W.3d at 52. Due process requires that an out-of-state defendant "can be subject to personal jurisdiction only if he has such minimum contacts with the forum state that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 53 (citing *J.I. Case Corp. v. Williams*, 832 S.W.2d 530, 531-32 (Tenn. 1992)). Our courts recognize both general and specific jurisdiction, and First Southern argues that the facts in this case support either type of jurisdiction.[4]

As stated by our Supreme Court, in the absence of continuous and systematic contacts sufficient to confer general jurisdiction, "personal jurisdiction exists if a 'commercial actor purposely directs his activities toward citizens of the forum state and litigation results from injuries arising out of or relating to those activities.'" *Chenault*, 36 S.W.3d at 53 (quoting *J.I. Case*, 832 S.W.2d at 532). Tennessee courts have adopted three primary factors and two lesser factors to be considered in determining whether the necessary "minimum contacts" exist. *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985). The three primary factors are: (1) the quantity of the contacts, (2) the nature and quality of the contacts, and (3) the source and connection of the cause of action with the contacts. *Id.* at 334. The two lesser factors to be considered are the interest of the forum state and the convenience of the parties. *Id.*

In opposing the defendants' motion to dismiss, First Southern submitted an affidavit of Mr. Brink outlining the history of the business dealings between Mr. Brink and Mr. Weisser, including Mr. Brink's assistance in obtaining financing for Mr. Weisser regarding real estate transactions in Tennessee. Mr. Brink further detailed the parties' dealings regarding the Hazard, Kentucky shopping center:

---

[4]General jurisdiction exists "when a defendant has 'continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims.'" *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998) (quoting *Kerry Steel v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). Specific jurisdiction confers jurisdiction only on claims that "'arise out of or relate to a defendant's contacts with the forum." *Id.*

Mr. Weisser first contacted me about the transaction that is the subject of the complaint in this case in early 2004. As he had done many times before, he contacted me at my office in Brentwood, Tennessee and asked for First Southern's assistance in obtaining a mortgage loan commitment in the amount of twenty-two million dollars ($22,000,000) so that he could acquire certain real property located in Hazard, Kentucky. He told me that the Property would ultimately be owned by a single asset entity to be formed later in connection with the acquisition.

In exchange for our work obtaining a loan commitment and negotiating the terms thereof, Weisser agreed to pay to First Southern a fee in the amount of one hundred fifty thousand dollars ($150,000). Although the written documents do not specifically identify a place for payment, all of my contacts with Mr. Weisser were from my office at First Southern in Brentwood, Tennessee, and our clear contemplation at that time of contracting was that the fee would be paid to Southern in Williamson County, Tennessee, absent specific directions to the contrary.

First Southern provided substantial and valuable assistance to Weisser in locating financing for the acquisition of the Property, and negotiating financing terms to purchase the Property that were acceptable to Weisser. These efforts were conducted by me from my offices in Brentwood, Tennessee.

In his affidavit, Mr. Weisser stated, in part:

Stephen Brink and Southern Mortgage are mistaken in alleging that the undersigned is doing business in the State of Tennessee. I have never owned any real estate personally in the State of Tennessee, nor have I personally engaged in any business activity in the State. The only transactions that I have ever done with Stephen Brink with Southern Mortgage involved financing of properties outside of the State of Tennessee, and the only communications that Mr. Brink and I had were via telephone or via e-mail, not with me personally coming to the State of Tennessee and meeting with him at any time.
. . . .

The allegations in the complaint state that Southern Mortgage procured a lender with respect to financing a property. However, that lender, PNC Bank, is located in Kansas City; the property which was the subject of the financing is located in Kentucky. Other than the fact that Southern Mortgage maintains its offices in Tennessee, there is absolutely no scintilla of fact to suggest that any business was being conducted in Tennessee by any of the parties. My communications with PNC Bank were all sent and received to/from Kansas City.

Taking the facts set forth in Mr. Brink's affidavit as true and resolving any factual disputes in favor of First Southern, we must determine whether First Southern made out a prima facie case of personal jurisdiction with respect to Mr. Weisser. We first examine Mr. Weisser's contacts with Tennessee in relation to this cause of action. Mr. Brink stated that Mr. Weisser contacted him at his

offices in Tennessee and asked him to provide assistance in obtaining financing for the purchase of the shopping center in Kentucky. Mr. Brink further stated that he provided the requested services from his offices in Tennessee and that the parties expected his fee to be paid to First Southern in Tennessee. In his affidavit, Mr. Weisser emphasized that he and Mr. Brink communicated by telephone and e-mail, and that he did not physically go to Tennessee to meet with Mr. Brink. However, a defendant's physical presence in the forum state is not required to conduct business there. *Masada*, 697 S.W.2d at 334.

In *United Agric. Svcs., Inc. v. Scherer*, 17 S.W.3d 252, 254 (Tenn. Ct. App. 1999), United Agricultural Services, Inc., a Tennessee corporation, provided environmental inspection services at the request of a mortgage company processing a loan guaranteed by Mr. Scherer to buy some property in Michigan. *Id.* at 259. Although no representative of Mr. Scherer's company ever came to Tennessee, it was undisputed that, after the field work in Michigan, United Agricultural Services did all of the work necessary to generate the required reports in its Memphis office. *Id.* The court found the exercise of personal jurisdiction over Mr. Scherer was proper.[5] *Id.; see also Cole v. Miletti*, 133 F.3d 433, 436 (6th Cir. 1997) (finding that Ohio had specific jurisdiction over a California resident who negotiated and executed a contract by telephone and through the mail with an Ohio resident).

Mr. Weisser sought out Mr. Brink's services and entered into a contract with him for services performed by Mr. Brink from his offices in Tennessee. Mr. Weisser purposefully availed himself of the privilege of transacting business in Tennessee, and the present cause of action arises from Mr. Weisser's business contacts in the state of Tennessee. *See Masada*, 697 S.W.2d at 335. As to the two lesser factors, Mr. Weisser is a Florida businessman with interests in companies and properties in Tennessee. There is no reason to conclude that requiring him to defend litigation in Tennessee constitutes an unexpected or unreasonable burden. Moreover, the state of Tennessee has an interest in resolving contract disputes involving its residents. *Id.* at 335.

We have concluded that First Southern made out a prima facie case of personal jurisdiction over Mr. Weisser and, therefore, the trial court properly declined to grant Mr. Weisser's motion to dismiss. It should be noted that the issue of Mr. Weisser's personal liability for the loan commitment fee is a contested issue in this litigation. As will be discussed more fully below, Mr. Weisser argues that he was acting on behalf of MHW Properties or some other entity when he entered into the contract with First Southern. At this stage of the litigation, however, First Southern only had to make a prima facie case in support of personal jurisdiction to survive the motion to dismiss. Should discovery and/or a trial cast doubt on the factual basis of First Southern's case against Mr. Weisser, he can renew his motion to dismiss for lack of personal jurisdiction. *See Chenault*, 36 S.W.3d at 58.

## Venue

_____

[5]We recognize that, in *Scherer,* Mr. Scherer was acting as an agent for a corporation and that the basis for personal jurisdiction over him was his role as guarantor of the note. *Scherer*, 17 S.W.3d at 259. The court's analysis is instructive in the present case because First Southern alleges that Mr. Weisser was acting on his own behalf or as promoter for a company not yet in existence.

Mr. Weisser also argues that the trial court erred in failing to dismiss the case on the basis that venue was not proper in Williamson County. This argument is without merit.

Under Tenn. Code Ann. § 20-4-101, civil actions of a transitory nature may be brought in the county where the cause of action arose. When the gravamen of the action is the collection of a debt in a specific amount, the action is generally said to arise in the county where the creditor resides. *Tinker-Watkins Sand & Gravel, Inc. v. Parsons*, No. W2003-02048-COA-R3-CV, 2004 WL 689880, *3 (Tenn. Ct. App. Mar. 31, 2004); *Insituform of North America, Inc. v. Miller Insituform, Inc.*, 695 S.W.2d 198, 200 (Tenn. Ct. App, 1985). In this case, there was no express contract provision regarding where payment would be made to First Southern. In his affidavit, Mr. Brink stated that the parties understood that payment was to be made to First Southern in Williamson County. Under these circumstances, First Southern's case was properly brought in Williamson County. No other Tennessee county would be a more appropriate forum for the filing of the claim.

## Summary judgment

Mr. Weisser argues that summary judgment was not proper because genuine issues of material fact exist with respect to two main issues: (1) whether the loan placement fee had been earned by First Southern, and (2) whether Mr. Weisser could be held personally liable for the loan placement fee.

Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Pub'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

The interpretation and application of unambiguous contracts are issues of law, the determination of which enjoys no presumption of correctness on de novo appellate review. Tenn. R. App. P. 13(d)*; Doe v. HCA Health Servs. of Tennessee, Inc*., 46 S.W.3d 191, 196 (Tenn. 2001). In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). If the terms of a contract are unambiguous, a court must determine the intent of the parties as expressed in the four corners of the contract. *Rogers v. First Tennessee Bank Nat'l Ass'n*, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987). The parol evidence rule generally prohibits the use of extrinsic evidence to alter or contradict the plain meaning of an unambiguous written contract. *Stamp v. Honest Abe Log Homes, Inc.*, 804 S.W.2d 455, 457 (Tenn. Ct. App. 1990); *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991). Any "[a]mbiguous language in a

contract is construed against the drafter." *Jackson v. Miller*, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989).

(1)

Loan commitment

Mr. Weisser argues that there are material facts in dispute (a) as to whether PNC issued a loan commitment in substantial compliance with the loan placement agreement and (b) as to whether the placement fee was earned and payable prior to closing.

(a) Did First Southern obtain a loan commitment substantially in accordance with the loan placement agreement?

The loan placement agreement provides, in pertinent part:

The undersigned (hereinafter referred to as "Applicant") hereby grants First Southern Mortgage Corporation (First Southern) the exclusive right to negotiate on behalf of the Applicant a mortgage loan commitment in the amount of $22,000,000 for the Property known as Wal-Mart SuperCenter in Hazard, Kentucky. *Said loan is subject to terms and conditions of the attached PNC Loan Application (PNC Application).*

The Applicant agrees to accept the loan in the above amount and agrees to the payment of a Loan Placement Fee of $150,000, *which will be considered an earned and due Loan Placement Fee when the loan commitment is issued substantially in accordance with the loan application by Lender. . . .*

(emphasis added).

On August 20, 2004, PNC sent Mr. Weisser a rider notifying him that the loan application had been approved by the bank subject to certain conditions, including the requirement of obtaining an estoppel letter from Wal-Mart. Mr. Weisser signed the rider accepting and agreeing to the loan commitment on behalf of a to-be-formed single asset entity on September 1, 2004. Mr. Weisser subsequently proposed amendments to the rider, which were accepted by PNC with one exception on September 15, 2004. Mr. Weisser then conditioned his acceptance of the amendments on two additional changes. On October 15, 2004, Mr. Weisser signed on behalf of a to-be-formed entity accepting and agreeing to two amendments to the loan commitment. Once Mr. Weisser accepted the rider without any changes on September 1, 2004, he had entered into a contract with PNC. At that point, First Southern had obtained a loan commitment in accordance with the loan placement agreement. The parties subsequently made some additional substantive changes, which were formalized on October 15, 2004. Pursuant to the language of the loan placement agreement, First Southern had presented Mr. Weisser with a loan commitment and he had accepted the terms and conditions of the commitment. At this point, First Southern had earned the loan placement fee in accordance with the agreement.

This interpretation is also consistent with the letter sent by Mr. Brink to Mr. Weisser on October 20, 2004:

> This letter will confirm that First Southern Mortgage Corp. has delivered to you and you have accepted the loan commitment from PNC Real Estate Finance which was in accordance with the PNC Application. It is also agreed that the Loan Placement fee of $150,000 will be reduced to $140,000. Please sign below indicating your agreement to this addendum to the Loan Placement Agreement.

Mr. Weisser signed under "MHW Properties" as provided on the letter. However, Mr. Weisser testified that he was only signing the letter to acknowledge the reduced loan placement fee, not to acknowledge that he had accepted a loan commitment in accordance with the loan application.

The parties' subsequent actions are consistent with the conclusion that First Southern had presented Mr. Weisser with a loan commitment substantially in accordance with his loan application. PNC and Mr. Weisser entered into additional amendments to the loan commitment to extend the date of its expiration. Moreover, as provided in the first amendment to the loan commitment signed by Mr. Weisser on October 15, 2004, Mr. Weisser made a deposit of $228,000 to PNC and locked in an interest rate.[6]

Based upon the language of the loan placement agreement and the undisputed facts as to the above course of events, the trial court did not err in concluding that First Southern had provided a loan commitment in accordance with the agreement. There was no ambiguity requiring the court to go beyond language of the contract. PNC agreed to loan money to Mr. Weisser's to-be-formed entity, and Mr. Weisser agreed to the terms and conditions in the loan commitment, including the condition of obtaining a satisfactory estoppel letter from Wal-Mart.

(b) Was the commitment fee earned and payable prior to closing?

Mr. Weisser further argues that the course of dealing between the parties required that the placement fee was not to be paid until the closing of the sale.

As quoted above, the loan placement agreement states that the loan placement fee would "be considered an earned and due Loan Placement Fee when the loan commitment is issued substantially in accordance with the loan application by Lender." As discussed above, First Southern successfully presented a loan commitment on or before October 15, 2004. Given the unambiguous language of the parties' contract, we see no basis for the trial court to consider parol evidence as to the parties' course of dealings. The fact that the loan fee was typically paid by the buyer at closing does not mean that the fee was not actually due and payable before that.

The third paragraph of the loan placement agreement is consistent with this interpretation:

---

[6]Mr. Weisser subsequently made an additional deposit of $114,000.

*If financing is arranged as per the provisions of this Agreement, and the Applicant refuses to accept the same* or if the Applicant, during the term of this Agreement, secures financing with a lender, investor or other lending source, directly or indirectly (or by use of a third party) other than through the efforts of the First Southern, then the total Loan Placement Fee *shall be considered earned as liquidated damages for the failure of the Applicant to accept the financing as arranged, or by breach of this Agreement. Such fee shall be paid immediately.*

These provisions expressly contemplate the earning of a loan placement fee even if the applicant chooses not to use the proposed financing.

In support of his argument, Mr. Weisser points to his own testimony as to the meaning of the loan placement agreement:

Q.      Did you understand when you signed this agreement that the Loan Placement Fee of $150,000 would be considered earned and due when the loan commitment was issued substantially in accordance with the loan application.

A.      Yes.

Q.      That is, as I understand it, different from the agreement that you said you made with Mr. Brink at the time you originally spoke with him?

A.      I didn't see it as different.

Q.      Okay. I thought I understood you to say earlier that the loan commitment would not be earned until and unless a closing occurred. Am I – did I misunderstand you?

A.      No. That's still my opinion of what this means.

Q.      This says it's earned when the loan commitment is issued. It doesn't say anything about closing, does it?

A.      It says when the loan commitment is issued in accordance with the loan application and substantially in accordance with the loan application. To my way of thinking, it still meant that we had to have a closing.

Q.      Why did you think that?

A.      Because that's my understanding of this.

As stated above, the language of the loan placement agreement is clear and unambiguous. It is our duty to interpret that language as it is written. Where there is no ambiguity, we do not consider parol evidence that one party had an understanding of the agreement that was in conflict with the express

-11-

language of the contract. Likewise, we do not consider Mr. Weisser's understanding of the significance of his signing of the October 20, 2004 letter from Mr. Brink since that understanding is in conflict with the letter itself.

Mr. Weisser also points to Mr. Brink's deposition testimony that if Mr. Weisser had not been successful in his litigation with Wal-Mart and was therefore unable to buy the property in Hazard, Kentucky, First Southern would probably have waived the placement fee. The fact that First Southern might choose to waive its right to a fee does not, however, indicate that such a fee was not earned unless the sale closed.

Also highlighted by Mr. Weisser are two letters he sent to Mr. Brink stating that First Southern's placement fee would be earned if the financing successfully closed. When he received the first letter, Mr. Brink notified Mr. Weisser that the requested modification was not consistent with their agreement and that he did not consent to it. Mr. Brink testified that he never received the second letter. Mr. Weisser admitted in his testimony that Mr. Brink never gave his express consent to Mr. Weisser's statement that the fee would not be due until closing.

We conclude that the trial court did not err in granting summary judgment on the issue of whether the loan placement fee was earned by and due to First Southern.

(2)
Mr. Weisser's personal liability

The remaining issue is whether the trial court erred in granting summary judgment against Mr. Weisser personally.

First Southern emphasizes the fact that Mr. Weisser did not raise this argument in its initial response to First Southern's motion for summary judgment. As a result, the propriety of holding Mr. Weisser personally liable for the loan commitment fee was not addressed by the trial court in its order granting summary judgment. However, since Mr. Weisser raised this issue in his motion to alter or amend, we will consider it here.

The loan placement agreement itself, the key document, was signed by Mr. Weisser on behalf of MHW Properties. Mr. Brink's letter of October 20, 2004, was addressed to Mr. Weisser at MHW Properties and provided a signature line for Mr. Weisser on behalf of MHW Properties.[7] On its face, the loan placement agreement indicates that it was MHW Properties, not Mr. Weisser personally, that was agreeing to pay the loan commitment fee. However, Mr. Weisser testified that MHW Properties, though still in existence, had not been active since 2003 and had no relationship to the transactions at issue here. Mr. Brink testified that his office had mistakenly put MHW Properties on the contract and on the correspondence.

---

[7]Mr. Weisser's letters to Mr. Brink and to PNC were on the letterhead of The Weisser Realty Group, Inc.

After Mr. Brink began negotiating with PNC on behalf of Mr. Weisser/MHW Properties, he informed Mr. Weisser that the loan would have to be made to a single asset entity. Thus, Mr. Weisser signed the loan application and the loan commitment documents on behalf of "a to-be-formed single asset entity." The loan application included a statement that First Southern was acting as mortgage banker and that the borrower, the to-be-formed single asset entity, was responsible for paying the mortgage banker's fee.

In his deposition testimony, Mr. Weisser made the following statements:

Q.    Well, do you know why MHW Properties' name would appear on any of those documents?

A.    No, I don't.

Q.    If MHW's name does appear on some of those documents, would it just be a mistake?

A.    Probably by my secretary. You know, she has a computer that has the – I guess the header on it.

Q.    MHW Properties, Inc. was not involved in any way in the transaction that is the subject matter of this lawsuit, right?

A.    That's correct.

        . . . .

Q.    Well, let me ask it another way. When you were negotiating for the acquisition of the property itself, who were you negotiating for?

A.    I'd say for myself, my family. We didn't have another entity at the time, although it was contemplated that it would go into another entity.

Q.    Okay. And same thing when you were discussing with Mr. Brink his role in this transaction, which hat were you wearing? Who were you representing in connection with those discussions?

A.    The entity that was going to borrow the money.

We have concluded that there are genuine issues of material fact as to whether Mr. Weisser should be personally liable for the loan placement fee. Mr. Weisser himself entered into a contract with the Wal-Mart property owner to buy the property. He signed the loan placement agreement with First Southern on behalf of MHW Properties, an entity that both parties seem to agree was not involved in these transactions. The loan commitment was signed by Mr. Weisser on behalf of a to-

be-formed single asset entity.[8]  If Mr. Weisser signed the loan placement agreement on behalf of a to-be-formed entity, it appears that he was acting as a promoter.  The liability of a promoter for a pre-incorporation contract depends upon the intention of the parties. *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623 (Tenn. Ct. App. Sept. 24, 1998); *Kemmons Wilson, Inc. v. Allied Bank of Texas*, No. 02A01-9107CF00131, 1992 WL 1982, *5 (Tenn. Ct. App. Jan. 3, 1992).  Based upon the evidence in the record, genuine issues remain regarding upon whose behalf Mr. Weisser was acting and the intention of the parties.  Therefore, the trial court erred in granting summary judgment against Mr. Weisser.

## Conclusion

Because we find that the trial court erred in granting summary judgment against Mr. Weisser individually, we reverse the decision of the trial court.  Costs of appeal are assessed against the parties equally.

_____
ANDY D. BENNETT, JUDGE

---

[8]Mr. Weisser testified that Hazard Wal-Mart SuperCenter, Ltd. is that entity.